UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACKET INTELLIGENCE LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>JUNIPER NETWORKS INC,<br><br>    Defendant. | Case No. 19-cv-04741-WHO<br><br>**ORDER REGARDING MOTION TO DISQUALIFY**<br><br>Re: Dkt. No. 55 |

Defendant Juniper Networks Inc. ("Juniper") moves to disqualify Dr. Kevin Almeroth, an expert witness retained by defendant Packet Intelligence LLC ("Packet") in this action. Juniper previously retained Dr. Almeroth in connection with a patent dispute with a third party, Palo Alto Networks, LLC ("PAN"), that is also a party in a case related to this one. Juniper has provided evidence demonstrating that Dr. Almeroth's prior work involved analysis of some of the accused products and patents at issue in this matter. Packet opposes disqualification largely based upon the content of Dr. Almeroth's reports in the prior litigation, but does not dispute or substantively challenge Juniper's evidence. I find that Juniper has satisfied its burden of showing that Dr. Almeroth received relevant privileged and confidential information from Juniper, and that it had a reasonable expectation of a confidential relationship with him. Juniper's motion is GRANTED.

## BACKGROUND

**I. DR. ALMEROTH'S PRIOR WORK FOR JUNIPER**

Packet first filed this patent infringement lawsuit on August 13, 2019. Dkt. No. 1. Claim construction is currently set for August 14, 2020. *See* Dkt. No. 54. On May 29, 2020, Juniper filed this motion to disqualify Dr. Almeroth, which Packet opposes. Dkt. Nos. 55 ("Mot."), 59 ("Oppo.").

According to Juniper, it retained Dr. Almeroth in connection with litigation between

1    Juniper and PAN in 2013.  Mot. at 4.  This included two cases in district court and two *Inter*
2    *Partes* Review ("IPR") proceedings (collectively, "PAN litigation").  *Id.*  Dr. Almeroth signed an
3    engagement letter with Juniper's outside counsel, Irell & Manella, on December 13, 2013.  Dkt.
4    No. 55-1 ("McPhie Decl.") ¶¶ 1-3.  The retention letter states that in exchange for Dr. Almeroth's
5    analysis and opinions as an independent consultant, he would be paid $600 per hour.  Dkt. No. 55-
6    2 at 1-2.  It further provides that Juniper may need to disclose to Dr. Almeroth "legal theories,"
7    "confidential work product," and "other privileged or confidential information" necessary for him
8    "to fully carry out [his] responsibilities under this agreement."  *Id.*  Dr. Almeroth agreed not to
9    disclose confidential or privileged Juniper information "during and after" his engagement unless
10   authorized by Juniper's attorneys, and to keep all Juniper information "in strict confidence."  *Id.* at
11   2.  Dr. Almeroth agreed to immediately notify Juniper's counsel if any unauthorized entity
12   attempted to obtain this information, and to take any "legal action …as Irell deems necessary or
13   appropriate to resist or seek protection against disclosure."  *Id.*

14   With its motion, Juniper submitted a declaration of David McPhie, its counsel who worked
15   with Dr. Almeroth in the PAN litigation.  McPhie asserts that in the course of Dr. Almeroth's
16   employment with Juniper, Dr. Almeroth prepared and submitted two expert reports in the IPR
17   proceedings providing opinions on issues of claim construction, validity, and non-obviousness.
18   Mot. 6.  These reports provided opinions on Juniper's U.S. Patent No. 7,107,612 (the "'612
19   Patent") and U.S. Patent No. 7,734,752 (the "'752 Patent").  McPhie Decl. ¶ 5.  In addition, Dr.
20   Almeroth testified at deposition in one of the IPR proceedings and "consulted with Juniper on its
21   litigation strategies and the technologies, products, and prior art at issue in those matters."
22   McPhie Decl. ¶ 6; Mot. 6.

23   According to Juniper, "[t]he technical subject matter of Dr. Almeroth's work and
24   consultation with Juniper included flow/session technologies, intrusion and detection prevention,
25   Juniper's 'JUNOS' operating system, and Juniper's SRX and MX Series products," and his reports
26   "provide opinions on issues of claim construction, invalidity, and non-obviousness, including
27   secondary considerations based on the SRX Series products."  Mot. 6.  Outside counsel had
28   "multiple conversations" with Dr. Almeroth that "included litigation strategy as well as

1  substantive arguments regarding Juniper products and the prior art." McPhie Decl. ¶ 8. This
2  included technical consultation on flow/session technologies, Juniper's JUNOS operating system,
3  and Juniper's SRX and MX Series products. *Id.* ¶ 8. Neither Juniper nor Dr. Almeroth have
4  served any notice to terminate Dr. Almeroth's agreement set forth in the retention letter. *Id.* ¶ 4.
5  Dr. Almeroth was paid $85,808.02 for his work for Juniper. *Id.* ¶ 9.
6      On December 17, 2019, Packet disclosed Dr. Almeroth as its claim construction expert in a
7  Joint Claim Construction Statement in the related matter against PAN that is pending before me.
8  *See Packet Intelligence v. Palo Alto Networks*, Case No. 19-cv-2471 (N.D. Cal.) ("*Packet I*"
9  litigation), Dkt. No. 46; Oppo. 12. On January 7, 2020, Juniper's counsel in this matter attended a
10 Joint Case Management conference. *Packet I*, Dkt. No. 50. On March 20, 2020, Packet disclosed
11 Dr. Almeroth for purposes of extrinsic evidence in this case in its Patent Local Rule 4-2
12 disclosures to Juniper. Oppo. 12. On April 15, 2020, Packet served a draft of a Joint Claim
13 Construction Statement which disclosed Dr. Almeroth. Oppo. 12. On April 21, 2020, both parties
14 filed a Joint Claim Construction Statement that attached a declaration of Dr. Almeroth on behalf of
15 Packet. Dkt. No. 54 at 2. On April 30, 2020, Juniper notified Packet Intelligence of its objection
16 to Dr. Almeroth. Dkt. No. 55-6.

## LEGAL STANDARD

18     Federal courts have the inherent power to disqualify expert witnesses to protect the
19 integrity of the adversarial process, protect privileges that otherwise may be breached, and
20 promote public confidence in the legal system. *See Campbell Indus. v. M/V Gemini*, 619 F.2d 24,
21 27 (9th Cir. 1980) ("A district court is vested with broad discretion to make discovery and
22 evidentiary rulings conducive to the conduct of a fair and orderly trial"). However,
23 disqualification is a "drastic measure that courts should impose only hesitantly, reluctantly, and
24 rarely." *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp.2d 1087, 1092 (N.D. Cal. 2004). In
25 *Hewlett-Packard*, the court set forth a two-factor test, in which "disqualification of an expert is
26 warranted based on a prior relationship with an adversary if (1) the adversary had a confidential
27 relationship with the expert and (2) the adversary disclosed confidential information to the expert
28 that is relevant to the current litigation." *See id.* at 1092–93 (internal citations omitted). I should

1 additionally consider whether disqualification would be fair to the affected party and would

2 promote the integrity of the legal process. *Id.* at 1093.

## DISCUSSION

### II.   CONFIDENTIAL RELATIONSHIP

Juniper must show that it was "reasonable for it to believe that a confidential relationship existed" with Dr. Almeroth. *Id.* In evaluating the reasonableness of a party's assumption on this point, courts may consider many factors, including:

> whether the relationship was one of long standing and involved frequent contacts instead of a single interaction with the expert, whether the expert is to be called as a witness in the underlying case, whether alleged confidential communications were from expert to party or vice-versa, and whether the moving party funded or directed the formation of the opinion to be offered at trial.

*Id.* (citation omitted). Other factors include "whether the parties entered into a formal confidentiality agreement, whether the expert was retained to assist in the litigation, the number of meetings between the expert and the attorneys, whether work product was discussed or documents were provided to the expert, whether the expert was paid a fee, whether the expert was asked to agree not to discuss the case with the opposing parties or counsel, and whether the expert derived any of his specific ideas from work done under the direction of the retaining party." *Id.*

There is no real dispute that Juniper and Dr. Almeroth were engaged in a confidential relationship since at least December 2013. Dr. Almeroth entered into a formal agreement to assist Juniper in its litigation against PAN and served as an expert in two prior district court proceedings and two IPR proceedings. He was paid a substantial amount for his services. I find that Juniper had a reasonable expectation of a confidential relationship with Dr. Almeroth.

### III.   CONFIDENTIAL INFORMATION

The heart of the parties' dispute concerns whether Juniper disclosed confidential information to Dr. Almeroth that is related to the current litigation. Confidential information is information "of either particular significance or [that] which can be readily identified as either attorney work product or within the scope of the attorney-client privilege." *Id.* at 1094 (citation omitted). "It could include discussion of the party's 'strategy in the litigation, the kinds of experts [the party] expected to retain, [the party's] view of the strengths and weaknesses of each side, the

4

role of each of the [party's] experts to be hired and anticipated defenses." *Id.* (citation omitted).

Packet first argues that the work that Dr. Almeroth performed for Juniper did not require Juniper's confidential information and was based upon public information. Oppo. 3-4, 9-10. It asserts that "[t]he information about Dr. Almeroth's activities on behalf of Juniper and the information disclosed to him by Juniper pertained only to two IPR proceedings over the validity of Juniper patents, redacted excerpts of a declaration that Dr. Almeroth executed in connection with one of the IPRs, and the declaration of Juniper's outside counsel, David McPhie." *Id.* at 3. The IPR proceedings related to nonobviousness and were based on publicly available information. *Id.* at 4. Packet also claims that Juniper has not described any infringement analysis conducted by Dr. Almeroth or provided any indication that the patents at issue in the prior litigation with PAN involved the patents at issue here. *Id.* at 3.

Packet's arguments are contradicted by the evidence presented by Juniper. Juniper provided sworn testimony that Dr. Almeroth provided opinions related to Juniper's products (a point that Packet acknowledges) and discussed litigation strategy. Packet's assertions to the contrary are unsupported by any evidence. The fact that Dr. Almeroth's earlier declarations discuss validity and could have been prepared without access to confidential information is not irreconcilable with Juniper's assertions that Dr. Almeroth received confidential information regarding its products and had privileged communications with counsel regarding litigation strategy.

Second, Packet argues that Juniper's description of Dr. Almeroth's work is vague and conclusory. *Id.* at 4-5, 7-8. Juniper's outside counsel, David McPhie, asserted that he had "multiple conversations . . . in person and over the phone in which we discussed privileged and confidential information belonging to Juniper." McPhie Decl. ¶ 8. He further stated that the discussions "included litigation strategy as well as substantive arguments regarding Juniper's products and the prior art, including the issues addressed in his expert reports." *Id.* Although Packet contends that these statements are insufficiently specific to support disqualification, it does not contend that these statements are incorrect or provide evidence to contradict them.

Juniper provides more than conclusory statements that confidential information was

1   disclosed.  McPhie's declaration describes the specific patents and products that Dr. Almeroth
2   opined on.  Juniper also asserts that Dr. Almeroth analyzed a patent to which all the other patents-
3   in-suit are related.  Mot. 16.  It provided Dr. Almeroth's retention agreement and the total amount
4   he was paid for his work, which is consistent with McPhie's declaration of the amount of work
5   that Dr. Almeroth performed for Juniper.  This evidence is sufficiently specific.

6   None of the cases cited by Packet Intelligence are analogous to this case.  *See Finisar*
7   *Corp. v. Nistica, Inc.*, No. 13-cv-03345-BLF (JSC), 2015 U.S. Dist. LEXIS 94975, *18-19 (N.D.
8   Cal. July 21, 2015) (expert did not sign confidentiality agreement, had only introductory phone
9   call with counsel, and expert stated that "Finisar did not provide [her with] any confidential
10  information or legal strategy"); *Hewlett-Packard*, 330 F. Supp. 2d at 1096 (expert provided
11  competing declaration stating that he did not receive confidential information); *In re JDS*
12  *Uniphase Corp. Sec. Litig.*, No. C-02-1486 CW (EDL), 2006 WL 2845212, at *3 (N.D. Cal. Sept.
13  29, 2006) ("There has been no showing that Deloitte and OTT exchanged information about legal
14  strategies under any of the contracts, or that this litigation or any related litigation was pending
15  while Deloitte worked on any aspect of Lead Plaintiff's computer system").  Packet also cites
16  *Dolby Labs* to support its contention that parties seeking disqualification must describe the
17  specific confidential information disclosed.  Oppo. 8-9.  However, in that case the court found that
18  "legal strategies that were developed in connection with the '598 application" was too general a
19  description to support disqualification.  *Dolby Labs. v. Lucent Techs., Inc.*, 2003 U.S. Dist. LEXIS
20  27620 at *4-5 (N.D. Cal. March 17, 2003.) ("Lucent would have the Court infer from a general
21  description of the communications at issue over 12 years ago that confidential, relevant
22  information must have been revealed."); *see also Syngenta Seeds, Inc. v. Monsanto Co.*, 2004 U.S.
23  Dist. LEXIS 19817, at *9-11 (D. Del. Sept. 27, 2004) (no confidential relationship with expert,
24  and no specific facts regarding contents of communications).  By contrast, here Juniper provided a
25  specific description of the confidential information that was discussed with counsel.

26  Finally, Packet contends that Juniper has pointed to no confidential information that Dr.
27  Almeroth received that would impact his analysis for Packet in this case.  Oppo. 6.  Packet
28  concedes that "Dr. Almeroth presumably had access to *some* confidential information that was

6

used in his Juniper IPR Declaration to support the validity of Juniper's patents," yet asserts that this information does not bear on his infringement analysis in this case. *Id.* at 7. It also acknowledges that Dr. Almeroth analyzed some prior art references at issue in this case and the patent related to the patents Packet is asserting. *Id.* at 9-10.

Again, Packet's arguments fail because they are contradicted by Juniper's unrebutted evidence. McPhie asserts that Dr. Almeroth provided opinions on issues related to Juniper's SRX Series products, which are accused in this case. McPhie Decl. ¶ 5. The technical information to which Dr. Almeroth had access related to Juniper's JUNOS operating system and the SRX and MX Series of products, all of which are at issue here. *Id.* ¶ 8. McPhie also states that he had discussions with Dr. Almeroth in which he discussed "litigation strategy as well as substantive arguments regarding Juniper products and the prior art." Further, Juniper asserts that Dr. Almeroth analyzed a patent that is related to the patents in suit, as well as some of the prior art references at issue here. Mot. 6, 13-14.

Packet counters that "[n]othing in the attached Almeroth Declaration suggests that Dr. Almeroth relied on information specific to [the SRX and MX Series of Juniper products] other than information related to the JUNOS operating system." Oppo. 4. It argues that the record, including the declarations that Dr. Almeroth prepared for Juniper, demonstrates that Dr. Almeroth did not receive any confidential information from Juniper in the course of his work. *Id.* at 5. But once again, the fact that Dr. Almeroth's declarations do not discuss these products does not contradict McPhie's sworn testimony that he discussed the products and litigation strategies with Dr. Almeroth.

I find that Juniper has met its burden of establishing that Dr. Almeroth received relevant and confidential information.

## IV. PREJUDICE

In considering whether disqualification would be fair to Packet, I must also evaluate whether Packet would be unduly burdened by having to retain another expert and whether either party would be prejudiced. *See Hewlett-Packard*, 330 F. Supp. 2d at 1094–95. Packet asserts that Dr. Almeroth has provided "a significant amount of work in the past for Packet Intelligence

7

related to the patents asserted in litigation spanning several years." Oppo. 11. This includes analysis of prior art references, almost all of which are cited by Juniper in its invalidity contentions. *Id.* Dr. Almeroth has served as an expert witness in two trials, provided declarations in IPR proceedings, and has provided claim construction declarations. *Id.* at 2-3. Dr. Almeroth intends to provide claim construction declarations in this this case and the *Packet I* case, to which Juniper does not object. *Id.* Packet further states that "[i]f Dr. Almeroth were excluded from testifying, Packet Intelligence would incur extensive additional cost given the amount of time and expense it will take to get another technical expert up to speed." *Id.* at 11.

Juniper responds that expert reports are not due until January 26, 2021. Mot. 15. It does not object to Packet's use of Dr. Almeroth at claim construction "[s]o long as Dr. Almeroth is prohibited from further discussing this case with Packet Intelligence and further participating." *Id.* I agree with Juniper that Packet would not be unduly burdened by disqualification of Dr. Almeroth.[1] Packet may rely upon Dr. Almeroth for claim construction purposes. Packet does not dispute that it has adequate time to retain a new expert. Its only argument regarding the added cost of retaining a new expert is not a sufficient reason to otherwise deny a motion for disqualification. Any disqualification will result in costs to the party that must retain a new expert, and Packet provides no legal support for its position.

I also find that disqualification would promote the integrity of the judicial system by removing the appearance of impropriety, and that Juniper would be prejudiced if Dr. Almeroth were permitted to serve as an expert on validity and infringement issues. Mot. 15. Here, Juniper has provided evidence that it had a significant and longstanding relationship with Dr. Almeroth. Dr. Almeroth provided opinions related to the products and patents at issue in this case, in litigation involving a party to a related case. Permitting Dr. Almeroth to serve as an expert for Packet on infringement and validity issues would not simply pose a risk to Juniper, but would also create an appearance of impropriety. Accordingly, I find that any prejudice to Packet does not

---

[1] I do not find that it would be reasonable to prohibit Dr. Almeroth from further discussing claim construction issues with Packet. Packet may rely upon Dr. Almeroth for claim construction, but may not further discuss issues related to validity or infringement.

weigh against disqualification.[2]

## V. WAIVER

Packet contends that Juniper waived any objection to Dr. Almeroth's use as an expert by not seeking disqualification earlier. Oppo. 13. It asserts that it disclosed Dr. Almeroth as its expert in the *Packet I* litigation and as a claim construction expert in the joint Claim Construction Statement filed in that case in December 2019, and that Juniper cited Dr. Almeroth's testimony on behalf of Packet in earlier IPR proceedings in February 2020. Oppo. 12. Packet states that it disclosed Dr. Almeroth as an expert for purposes of extrinsic evidence in its Patent Local Rule 4-2 disclosures on March 20, 2020, and confirmed its reliance on Dr. Almeroth for claim construction on April 15. *Id.* In reply, Juniper states that it first objected to Dr. Almeroth on April 30, 2020, seven business days after Packet first confirmed that it would rely on Dr. Almeroth's opinions in this case. Dkt. No. 60 at 9.

I find that Juniper has not waived its objection. Even assuming that Juniper was aware of Dr. Almeroth's engagement in the *Packet I* litigation (to which it is not a party) or his use for claim construction in this case, it was not unreasonable to object only after Packet disclosed Almeroth as an expert in this case and for other purposes. Juniper does not object to Dr. Almeroth's use for claim construction, so it would have no reason to object to his engagement for those purposes earlier. In addition, Packet's citation of Dr. Almeroth's testimony in earlier IPR proceedings did not put Juniper on notice that Packet would use the expert for purposes other than claim construction in this case. *See* Oppo. 12. Juniper was aware of Dr. Almeroth's use for invalidity and infringement purposes in this case at the earliest on March 20, 2020. *Id.* It provided notice to Packet of its objection on April 30, 2020. Juniper was reasonably prompt in bringing its objections and did not waive them.[3]

---

[2] The parties dispute the "implied accusations" by Juniper regarding breach of Dr. Almeroth's engagement agreement. *See* Oppo. 10. Whether Dr. Almeroth in fact breached this agreement is not before me, and I need not consider that issue in resolving this motion.

[3] The cases that Packet relies upon are distinguishable. In *Travelers Ins. Co. v. Liljeberg Enterprises, Inc.*, the parties waited nearly a year before moving to disqualify a judge. 38 F.3d 1404, 1410–11 (5th Cir. 1994). In *Cent. Milk Producers Co-op. v. Sentry Food Stores, Inc.*, the party seeking disqualification waited over two years to move to disqualify a law firm. 573 F.2d

**CONCLUSION**

For the above reasons, Juniper's motion is GRANTED. Dr. Almeroth is disqualified as an expert for Packet in this case, except with respect to claim construction.

**IT IS SO ORDERED.**

Dated: July 15, 2020

William H. Orrick
United States District Judge

---

988, 992 (8th Cir. 1978).